# UNITED STATES DISTRICT COURT

AUG 11 2022

for the
Eastern District of Missouri

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
The 11 items listed within Attachment A, seized in connection ) Case No. 4:22-MJ-7203-SPM
with FBI case # 305G-SL-3632572, currently located at the )
FBI office located at 2222 market street, St. Louis, MO ) SIGNED AND SUBMITTED TO THE COURT FOR
63103. ) FILING BY RELIABLE ELECTRONIC MEANS

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
SEE ATTACHMENT A

located in the __EASTERN__ District of __MISSOURI__, there is now concealed *(identify the person or describe the property to be seized)*:
SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
☑ evidence of a crime;
☑ contraband, fruits of crime, or other items illegally possessed;
☑ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

*Code Section - Offense Description*
18 U.S.C. §§ 2422 ( the coercion or enticement of a minor ), 2423(a) (transportation of a minor with intent to engage in criminal sexual activity), 2251 (production of child pornography), and 2252 and 2252A (possession, receipt, and distribution of child pornography)

The application is based on these facts:

SEE ATTACHED AFFIDAVIT WHICH IS INCORPORATED HEREIN BY REFERENCE

☑ Continued on the attached sheet.
☐ Delayed notice of ____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

I state under the penalty of perjury that the foregoing is true and correct.

_____
*Applicant's signature*

Derek G. Velazco, Special Agent
*Printed name and title*

Sworn to, attested to, or affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedures 4.1 and 41.

Date: __08/11/2022__

_____
*Judge's signature*

City and state: St. Louis, MO     Honorable Shirley Padmore Mensah, U.S. Magistrate Judge
*Printed name and title*

AUSA: Robert F. Livergood

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF<br>The eleven (11) items listed on Attachment A, seized in connection with FBI case # 305G-SL-3632572, currently located at the FBI office located at 2222 market street, St. Louis, MO 63103. | No. 4:22-MJ-7203-SPM<br><br>SIGNED AND SUBMITTED TO THE COURT FOR FILING BY RELIABLE ELECTRONIC MEANS<br><br>**FILED UNDER SEAL** |

**AFFIDAVIT IN SUPPORT OF**
**AN APPLICATION FOR A SEARCH WARRANT**

I, Derek G. Velazco, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search devices, presently located at the FBI St. Louis Office, 2222 Market Street, St. Louis, MO 63103, (hereinafter the "Devices") further described in Attachment A, for the things described in Attachment B.

2.      I am a Special Agent with the Federal Bureau of Investigation (FBI) in the St. Louis Division.  I have been an FBI agent since March 2017.  Additionally, I have been employed with the FBI for a total of 15 years, having served in several administrative and analytical roles prior to becoming a Special Agent. In the course of my duties, I have investigated both criminal and national security matters for my agency and in partnership with various other criminal investigative and intelligence agencies. These investigations have included terrorism and counterintelligence; however, the majority of my investigations have been related to violent crimes committed against children or human trafficking. I have received and provided training matters related to violent crimes against children and human trafficking.

3.     The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of Title 18, United States Code, Sections 2423(a), 2251, 2252, 2252A, and/or 2422 ( (the "SUBJECT OFFENSES[1]"), have been committed by Charles Andrew Mason ("MASON") and/or other persons yet to be determined.  There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

## DEVICES TO BE SEARCHED

5.     The devices to be searched (the "DEVICES") items seized collected by the Phelps County Sheriff's Office on July 28, 2022, from the MASON residence located at 326 Truman Street, Newburg, Missouri 65401, and currently held in connection with FBI case number 305G-SL-3632572, at the FBI office located at 2222 Market Street, St. Louis, MO 63103.  The DEVICES are further described in the Attachment A.

## DEFINITIONS

6.     The following definitions apply to this Affidavit and Attachments A and B to this Affidavit:

---

[1] The SUBJECT OFFENSES are: 18 U.S.C. §§ 2422 ( the coercion or enticement of a minor ), 2423(a) (transportation of a minor with intent to engage in criminal sexual activity), 2251 (production of child pornography), and 2252 and 2252A (possession, receipt, and distribution of child pornography).

2

  a. The term "computer" means an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing logical, arithmetic, or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such a device, but such term does not include an automated typewriter or typesetter, a portable handheld calculator, or other similar device. 18 USC § 1030(e).

  b. The term "minor" means any individual under the age of 18 years. 18 USC § 2256(1).

  c. "Sexually explicit conduct" means actual or simulated sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; bestiality; masturbation; sadistic or masochistic abuse; or lascivious exhibition of the anus, genitals, or pubic area of any person. 18 USC § 2256(2)(A).

  d. "Visual depiction" includes undeveloped film and videotape, and data stored on computer disk or by electronic means which is capable of conversion into a visual image. 18 USC § 2256(5).

  e. "Child pornography" includes any visual depiction, including any photograph, film, video, picture, or computer-generated image or picture, whether made or produced by electronic, mechanical, or other means, of sexually explicit conduct, where the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct or such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct. 18 USC § 2256(8)(A) or (C).

  f. "Identifiable minor" means a person who was a minor at the time the visual depiction was created, adapted, or modified; or whose image as a minor was used in creating, adapting, or modifying the visual depiction; and who is recognizable as an actual person by the person's face, likeness, or other distinguishing characteristic, such as a unique birthmark or other recognizable feature; and shall not be construed to require proof of the actual identity of the identifiable minor. 18 USC § 2256(9).

  g. "Computer passwords and data security devices," as used herein, consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a sort of digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software or digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

  h. The terms "records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade form (including, but not limited to, writings, drawings, painting), photographic form (including, but not limited to, microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, photocopies), mechanical form (including, but not limited to, phonograph records, printing, typing) or electrical, electronic or magnetic form (compact discs, electronic or magnetic storage devices, hard disks, CD-ROMs, DVDs, Personal

Digital Assistants (PDAs), Multi Media Cards (M.M.Cs), thumb drives, flash drives, optical disks, printer buffers, smart cards, memory calculators, electronic dialers, electronic notebooks, cellular telephones, as well as digital data files and printouts or readouts from any magnetic, electrical or electronic storage device).

i.  Electronic data may be more fully described as any information stored in the form of electronic, magnetic, optical, or other coding on computer media or on media capable of being read by a computer or computer-related equipment.

j.  "Child erotica" are materials or items that are sexually arousing to pedophiles but that are not in and of themselves obscene or which do not necessarily depict minors in sexually explicit poses or positions.

k.  "IP address" refers to a unique number used by a computer to access the Internet. IP addresses can be dynamic, meaning that the Internet Service Provider (ISP) assigns a different unique number to a computer every time it accesses the Internet. IP addresses might be static whereby the user's ISP assigns his computer a unique IP address – and that same number is used by the user every time his computer accesses the Internet. Numerical IP addresses generally have corresponding domain names. For instance, the IP address 149.101.10.40 traces to the corresponding domain name "www.cybercrime.gov". The Domain Name System or DNS is an Internet service that maps domain names. This mapping function is performed by DNS servers located throughout the Internet. In general, a registered domain name should resolve to a numerical IP address.

l.  "Sexually explicit conduct" means actual or simulated (a) sexual intercourse, including genital-genital, oral-genital, genital-anal, or oral-anal, whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic

5

or masochistic abuse; or (e) lascivious exhibition of the anus, genitals or pubic area of any person.

## SELECT NORTH CAROLINA CRIMINAL STATUTES

7. **§ 14-27.25. Statutory rape of a person who is 15 years of age or younger**

    a. A defendant is guilty of a Class B1 felony if the defendant engages in vaginal intercourse with another person who is 15 years of age or younger and the defendant is at least 12 years old and at least six years older than the person, except when the defendant is lawfully married to the person.

    b. Unless the conduct is covered under some other provision of law providing greater punishment, a defendant is guilty of a Class C felony if the defendant engages in vaginal intercourse with another person who is 15 years of age or younger and the defendant is at least 12 years old and more than four but less than six years older than the person, except when the defendant is lawfully married to the person.

8. **§ 14-202.1. Taking indecent liberties with children**

    a. A person is guilty of taking indecent liberties with children if, being 16 years of age or more and at least five years older than the child in question, he either:

        i. Willfully takes or attempts to take any immoral, improper, or indecent liberties with any child of either sex under the age of 16 years for the purpose of arousing or gratifying sexual desire; or

        ii. Willfully commits or attempts to commit any lewd or lascivious act upon or with the body or any part or member of the body of any child of either sex under the age of 16 years.

    b. Taking indecent liberties with children is punishable as a Class F felony.

## CHILD PORNOGRAPHY COLLECTOR CHARACTERISTICS

9. Most individuals who collect child pornography are sexually attracted to children, as their sexual arousal patterns and erotic imagery focus, in part or in whole, on children. The collection may be exclusively dedicated to children of a particular age/gender or it may be more diverse, representing a variety of sexual preferences involving children. Collectors of child pornography express their attraction to children through the collection of sexually explicit materials involving children, as well as other seemingly innocuous material related to children.

10. The above-described individuals may derive sexual gratification from actual physical contact with children, as well as from fantasy involving the use of pictures or other visual depictions of children or from literature describing sexual contact with children. The overriding motivation for the collection of child pornography may be to define, fuel, and validate the collector's most cherished sexual fantasies involving children.

11. Visual depictions may range from fully clothed depictions of children engaged in non-sexual activity to nude or partially nude depictions of children engaged in explicit sexual activity. In addition to child pornography, these individuals are also highly likely to collect other paraphernalia related to their sexual interest in children. This other material is sometimes referred to as "child erotica," further defined as any material relating to children that serves a sexual purpose for a given individual. "Child erotica" is broader and more encompassing than child pornography, though at the same time the possession of such corroborative material, depending on the context in which it is found, may be behaviorally consistent with the offender's orientation toward children and indicative of his/her intent. "Child Erotica" includes things such as fantasy writings, letters, diaries, books, sexual aids, souvenirs, toys, costumes, drawings, cartoons and non-sexually explicit visual images.

12. Child pornography collectors often reinforce their fantasies by taking progressive, overt steps aimed at turning such fantasy(ies) into reality in some, or all, of the following ways: collecting and organizing their child-related material; masturbating while viewing child pornography; engaging children, online and elsewhere, in conversations, sometimes sexually explicit conversations, to fuel and fortify the fantasy; interacting, both directly and indirectly, with other like-minded adults through membership in organizations catering to their sexual preference for children, thereby providing a sense of acceptance and validation within a community; gravitating to employment, activities and/or relationships which provide access or proximity to children; and frequently persisting in the criminal conduct even when they have reason to believe the conduct has come to the attention of law enforcement. These are need driven behaviors to which the offender is willing to devote considerable time, money, and energy in spite of risks and contrary to self-interest.

13. Child pornography collectors almost always maintain and possess their material(s) in the privacy and security of their homes or some other secure location, to include Internet cloud storage, such as Dropbox or Google cloud storage. The collection may include sexually explicit or suggestive materials involving children, such as photographs, magazines, narratives, motion pictures, video tapes, books, slides, drawings, computer images or other visual media. The collector is often aroused while viewing the collection and, acting on that arousal, he/she often masturbates, thereby fueling and reinforcing his/her attraction to children.

14. Due to the fact that the collection reveals the otherwise private sexual desires and intent of the collector and represents his most cherished sexual fantasies, the collector rarely disposes of the collection. The collection may be culled and refined over time, but the size of the collection tends to increase. Individuals who use a collection in the seduction of children or to

document the seduction of children treat the materials as prized possessions and are especially unlikely to part with them. Even if a child pornography collector deletes files from his hard drive or other electronic media, a computer expert is often able to retrieve those files using computer forensic tools.

**PROBABLE CAUSE**

15. On or about December 3, 2021, Phelps County Coroner Ernie Coverdell reported to the Phelps County Sheriff's Office (PCSO) that there was a case of possible child abuse. The case involved a 14-year-old minor female, ███., who had a black eye and superficial cuts on her wrists. The case was assigned to Detective Sergeant Alexander M. Maurer from PCSO to investigate.

16. Officer Maurer's investigation continued for several months. During the investigation he interviewed ███. on multiple occasions. ███'s explanation of her physical injuries evolved from occurring accidently to being physically abused by her father.

17. ███.'s ███ is CHARLES MASON, who is 37 years of age at present. Officer Mauer interviewed CHARLES MASON at MASON's residence, 326 Truman Drive, Doolittle (Newburg), Missouri. Officer Maurer told MASON there were accusations of physical abuse and concerns of ███. self-harming. MASON said they were handling the self-harm internally. Regarding the bruising, MASON was told by ███. she had run into a wall. MASON said there is no abuse in the home. MASON stated he did not beat his children, but that he does punish them appropriately. MASON said a hand has not been laid on ███. in years, referring to spanking. MASON stated the couple discipline their younger children by spanking them on the buttocks or placing them in time out. MASON stated there were several hotlines in the past, but they believe it was from their youngest daughter's biological ███. MASON denied choking the children and

9

excessively grabbing of their arms or wrists. MASON denied punching, kicking or biting the children.

18. Also, during the interview, MASON said about two weeks earlier he and ▮. took a trip to North Carolina for a Duke basketball game (The weekend of November 19, 2021). During this interview MASON stated he did not think that a crime was committed. He believed it is a misunderstanding. MASON said he has no use for child abusers and found it repulsive. Officer Maurer asked if MASON believed someone who abuses children deserved a second chance under any circumstances. MASON said he would not answer the question and believed it was an interrogation.

19. Officer Mauer also interviewed ▮, ▮.'s ▮ ▮ said about four months ago she and CHARLES MASON were separated. ▮ said they separated because CHARLES MASON had some things to work on. She said he was controlling and could be narcissistic at times. ▮ said there was never physical abuse by CHARLES MASON against her but he would kick down a door every once in a while. ▮ said the day they spoke to ▮ about her cutting her wrists, ▮. also disclosed she had been molested. ▮. would not tell ▮ who the suspect was. ▮. would not provide this information because it would "split the family wide open." ▮ said there are only four men in their family, CHARLES MASON, CHARLES MASON's father and brother, and a cousin.

20. On Tuesday, December 7, 2021, ▮. was interviewed at Kids' Harbor Too, a child advocacy center. ▮. said CHARLES MASON would not do anything bad when ▮ was home. ▮ has seen CHARLES MASON put his hands on ▮.'s and ▮.'s throats. In one instance ▮. attempted to stop CHARLES MASON and he slammed her on the floor. During the interview she disclosed that CHARLES MASON slapped her face which would leave bruising.

10

▮ said the abuse only happens at home. Usually, it happened in the morning when ▮ was gone. ▮ also disclosed during the CAC interview that her parents are very controlling.

21.  ▮. wrote a letter about being assaulted and gave it to a school counselor. The school counselor gave the letter to Officer Mauer for his investigation. Additionally, on July 28, 2022, ▮ was interviewed by Amy Howard, an FBI Child Adolescent Forensic Interviewer.[2] ▮. indicated that while in Durham, North Carolina, CHARLES MASON shared a hotel room with her. The hotel had a single bed. Following the Duke basketball game, CHARLES MASON came into the hotel room and sexually assaulted ▮. by inserting his penis into her vagina, and digitally penetrating. ▮ described resisting the attack but said she could not move or kick but asked CHARLES MASON to stop. ▮. stated CHARLES MASON pinned her arms above her head during the attack. CHARLES MASON eventually stopped the attack and took a shower. He also told her not to tell anyone and if she does, they will believe him, not her.

22.  In addition to the sexual attack in Durham, North Carolina, ▮ said that since age six or seven, CHARLES MASON instructed her and her sister, who shared a bedroom, to sleep in their underwear. ▮. said he would sometimes wake her up by touching her vagina, and sometimes wake her up by taking pictures of her or her sister. When they started to wake, CHARLES MASON gave them Benadryl and melatonin.

23.  On July 28, 2022, Phelps County Sheriff's Officers, with the assistance of your affiant and other FBI agents, executed a search warrant at CHARLES MASON's residence located at 326 Truman Street, Newburg, MO. During the execution of the search warrant,

---

[2] During the investigation, ▮. was interviewed on multiple occasions. As with the physical abuse, ▮'s explanation of the sexual abuse evolved.

11

officers seized several electronic devices including (other items were seized as well) which were later transferred to the FBI (case # 305G-SL-3632572):

- Lenovo Notebook with power cord, S/N: PF1CYRE8
- Acer Chromebook, S/N: NXHKKAA005030295317600
- Lenovo Notebook, S/N: P20727PM
- HP Chromebook,
- HP Chromebook,
- Lenovo Laptop, S/N: Unknown
- HP Tower Computer, S/N: 3CR2211480
- iPhone in a teal case
- A SanDisk 2GB, a SanDisk 32GB SD card
- iPhone in black "Cellhelmet" case

24. Also seized during this search warrant were melatonin, generic Benadryl, and a video cassette adapter with tape, one additional cassette tape.

## SEIZURE OF EQUIPMENT AND DATA

25. Based upon my knowledge, training and experience, I know that in order to completely and accurately retrieve data maintained in computer hardware or on computer software, to ensure accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that some computer equipment, peripherals, related instructions in the form of manuals and notes, as well as the software utilized to operate such a computer, be processed by a qualified computer specialist in a laboratory setting. This is true because of the following:

a. The volume of evidence. Computer storage devices (such as hard disks, diskettes, tapes, laser disks, etc.) can store the equivalent of thousands of pages of information. Additionally, a user may seek to conceal criminal evidence by storing it in random order with deceptive file names. Searching authorities are thus required to examine all the stored data to determine which particular files are evidence or instrumentalities of criminal activity. This sorting process may take weeks or months, depending on the volume of data stored and it would be impractical to attempt this kind of data analysis on-site.

b. <u>Technical requirements</u>. Analyzing computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know prior to the search which expert possesses sufficient specialized skills to best analyze the system and its data. No matter which system is used, however, data analysis protocols are exacting scientific procedures, designed to protect the integrity of the evidence and to recover even "hidden", erased, compressed, password-protected, or encrypted files. Since computer evidence is extremely vulnerable to tampering or destruction (both from external sources or from destructive code imbedded in the system as a "booby trap"), a controlled environment is essential to its complete and accurate analysis.

26. Due to the volume of the data at issue and the technical requirements set forth above, it may be necessary that the above-referenced equipment, software, data, and related instructions be processed by a qualified computer specialist in a laboratory setting.

13

27. Computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily available forensic tools. When a person "deletes" a file on a home computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space - - that is, in space on the hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space - - for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

**SEARCH METHODOLOGY TO BE EMPLOYED**

28. The search procedure of electronic data contained in computer hardware, computer software, and/or memory storage devices may include the following techniques (the following is a non-exclusive list, as other search procedures may be used):

    a. triage of computer system(s) and computer hardware to determine what, if any, peripheral devices and/or digital storage units have been connected to such computer

14

system(s), as well as a preliminary scan of image files contained on such system(s) and digital storage device(s) to help identify any other relevant evidence and/or potential victim(s);

      b.      examination of all of the data contained in such computer hardware, computer software, and/or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

      c.      searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

      d.      surveying various file directories and the individual files they contain;

      e.      opening files in order to determine their contents;

      f.      scanning storage areas;

      g.      performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are likely to appear in the evidence described in Attachment B; and/or

      h.      performing any other data analysis technique that may be necessary to locate and retrieve the evidence described in Attachment B.

## **CONCLUSION**

29.      Based on the above information, there is probable cause to believe that the SUBJECT OFFENSES have been violated, and that the property, evidence, fruits and

instrumentalities of these offenses, more fully described in Attachment B of this Affidavit, are located on the DEVICES described in Attachment A. Your Affiant requests authority to seize such material, specifically, that the Court issue a search warrant for these premises and all computers, computer hardware and media, and wireless telephones therein.

30. I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.

I state under the penalty of perjury that the foregoing is true and correct.

_____
DEREK G. VELAZCO
Special Agent
Federal Bureau of Investigation

Sworn to, attested to, and affirmed before me via reliable electronic means pursuant to Federal Rules of Criminal Procedure 4.1 and 41 on this _____ day of August 2022.

_____
HONORABLE SHIRLEY P. MENSAH
United States Magistrate Judge

16

## ATTACHMENT A

## DESCRIPTION OF THE DEVICES TO BE SEARCHED

The devices to be searched are currently held in connection with FBI case number 305G-SL-3632572, at the FBI office located at 2222 Market Street, St. Louis, MO 63103, and are described as follows:

| | | |
|---|---|---|
| Device # 1. | | Lenovo Notebook with power cord, S/N: PF1CYRE8 |
| Device # 2. | | Acer Chromebook, S/N: NXHKKAA005030295317600 |
| Device # 3. | | Lenovo Notebook, S/N: P20727PM |
| Device # 4. | | HP Chromebook |
| Device # 5. | | HP Chromebook |
| Device # 6. | | Lenovo Laptop |
| Device # 7. | | HP Tower Computer, S/N: 3CR2211480 |
| Device # 8. | | iPhone in a teal case |
| Device # 9. | | A SanDisk 2GB, a SanDisk 32GB SD card |
| Device # 10. | | iPhone in black "Cellhelmet" case |
| Device # 11. | | Video cassette adapter with tape, one additional cassette tape |

## ATTACHMENT B

## LIST OF ITEMS TO BE SEIZED

All records, items, and information relating to violations of Title 18, United States Code, Sections 2423(a), 2251, 2252, 2252A, and/or 2422 (the "SUBJECT OFFENSES"), that constitute fruits, evidence and instrumentalities of those violations involving CHARLES MASON ("MASON"), including:

1. All visual depictions, including still images, videos, films or other recordings of child pornography or minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, and any mechanism used for the distribution, receipt or storage of the same.

2. Any and all computer and cell phone passwords and other data security devices designed to restrict access to or hide computer or cell phone software, documentation, or data. Data security devices may consist of hardware, software, or other programming code.

3. Any and all documents, records, materials, emails, notes, and/or internet history pertaining to the production, possession, receipt or distribution of child pornography or visual depictions of minors engaged in sexually explicit conduct, as defined in 18 U.S.C. § 2256, or pertaining to an interest in child pornography whether transmitted or received.

4. Any and all documents, records, materials, emails, notes, invoices and/or internet history pertaining to the coercion or enticement of a minor (18 U.S.C. § 2422).

5. Any and all documents, records, materials, emails, notes, invoices and/or internet history pertaining to the transportation of a minor with intent to engage in criminal sexual activity (18 U.S.C. § 2423(a)).

2

6. Any and all records, documents, records, materials, invoices, notes and/or materials that pertain to accounts with any Internet Service Provider, as well as any and all records relating to the ownership or use of computer equipment found on the devices.

7. Documents, records and/or materials regarding the ownership and/or possession of the DEVICES.

8. During the course of the search, photographs and/or videos of the DEVICES may also be taken to record the condition thereof.

The terms "records," "documents," and "materials," as used in Attachment B, include all information recorded in any form, visual or aural, and by any means, photographic form, mechanical form or electrical, electronic or magnetic form.

As used in Attachment B, the term computer includes cellular telephones/smartphones.